**SIERRA CLUB, a nonprofit corporation, Plaintiff–Appellant,**

v.

**UNITED STATES DEPARTMENT OF ENERGY; the Secretary of Energy; United States Army Corps of Engineers, Defendants–Appellees.**

**No. 01–1158.**

United States Court of Appeals, Tenth Circuit.

April 19, 2002.

---

Neil Levine, Earthjustice Legal Defense Fund, Denver, Colorado, for Plaintiff–Appellant.

Andrew C. Mergen, United States Department of Justice, Environment & Natural Resources Division, Washington, DC (John C. Cruden, Acting Assistant Attorney General; Mark A. Brown, M. Alice

Thurston, and Elizabeth Ann Peterson, United States Department of Justice, Environment & Natural Resources Division, Washington, DC; Janet Masters, Attorney, Office of General Counsel, United States Department of Energy, Washington, DC; Derek G. Passarelli, Attorney, Golden Field Office, United States Department of Energy, Golden, Colorado; James D. Long, Attorney, Rocky Flats Field Office, United States Department of Energy, Golden, Colorado, on the brief), for Defendants–Appellees.

Before BRISCOE, HOLLOWAY, and MURPHY, Circuit Judges.

BRISCOE, Circuit Judge.

Plaintiff Sierra Club appeals the district court's dismissal of its lawsuit against the United States Department of Energy (DOE) and the United States Army Corps of Engineers for lack of ripeness. Sierra Club contends its procedural claims alleging that the DOE failed to comply with the National Environmental Policy Act (NEPA) and the Endangered Species Act (ESA) prior to issuance of a road easement are ripe for adjudication. We agree and reverse the decision of the district court with respect to those procedural claims.

### I.

The district court found the following background facts were established by the administrative record, and neither party disputed these facts:

In 1951, the United States acquired the Rocky Flats facility, located immediately east of Colorado State Highway 93, between Golden and Boulder, Colorado. From 1952 to 1992, the Rocky Flats facility processed plutonium and produced nuclear warhead triggers. In 1975, the government acquired additional surface rights to increase the size of the buffer zone (Buffer Zone) around the inner plant facilities. After this expansion, the site totaled 6,500 acres.

In 1977, the DOE took over the administration of Rocky Flats. In early 1992, plutonium processing ceased at Rocky Flats based, in part, on the ground contamination occurring in the area immediately surrounding the plant. Many portions of the larger Buffer Zone, however, escaped contamination.

Until 1992, the owners of the Rocky Flats subsurface were precluded from accessing their mineral rights. The subsurface mineral rights owners leased their rights to Western Aggregates, Inc. (WAI), which operates an existing gravel pit and grading facility directly west of the Buffer Zone . . .

The Buffer Zone is not accessible to the general public. Thus, the land is relatively untouched and pristine. The proposed mining area is located on a gravel plain that stores water in the spaces between the rocks. This relative abundance of water allows vegetation and wildlife to prosper in this area including one of twenty remaining xeric tall grass prairies in the world and a large population of the Preble's Meadow Jumping Mouse (the Mouse). On May 13, 1998, the United States Fish and Wildlife Service (FWS) listed the Mouse as a threatened species under the Endangered Species Act.

Aplt. App. at 51–52. Two hundred acres of the Buffer Zone are used by the DOE as a National Wind Technology Center (NWTC).

In 1997, Western Aggregates, Inc. (WAI) applied for and received an expansion of its mining permit from the Colorado Department of Natural Resources. The proposed expansion would expand the existing gravel mine to approximately 425 acres located in the Buffer Zone, including

a part of the land comprising the NWTC. Jefferson County, Colorado, conditionally approved WAI's rezoning application for the area.[1]

The DOE issued a road easement to WAI, which gave rise to Sierra Club's claims underlying this appeal. The easement allowed WAI and its successors[2] to build a road from Highway 128 across the NWTC to the proposed mining expansion and WAI's existing mining operations, thus facilitating the removal of the mined sand and gravel offsite. The use and occupation of the road were made subject to such rules and regulations as may be prescribed by the manager of the Golden, Colorado, field office of the DOE. Pursuant to a memorandum of understanding accompanying the easement, WAI agreed not to conduct any mining operations on that portion of the property comprising the NWTC for a period of twenty years after receiving approval from Jefferson County to do so. The grant of easement contained a clause stating that "[t]he construction, use, and/or operation and maintenance of said easement shall be performed without cost or expense to the Government under the general supervision and subject to the prior approval of the Manager of the Golden Field Office of the Department of Energy." *Id.* at 168. Further, the memorandum of understanding contained the following clause:

> DOE agrees that upon mutual agreement between WAI and DOE of appropriate terms and conditions, DOE shall

grant to WAI an easement traversing the NWTC over which WAI may construct, at no cost to DOE, a roadway connecting WAI's existing facilities to Highway 128 on the north. The general location of this easement is more particularly described in Attachment D which is incorporated herein by this reference.

*Id.* at 173.

## II.

Sierra Club filed this action seeking declaratory and injunctive relief against the DOE and the Army Corps of Engineers, alleging they failed to take necessary steps to protect valuable wetlands, open space, and habitat for the Preble's Meadow Jumping Mouse from the WAI's proposed expansion of its sand and gravel mine. The complaint contained eight claims for relief, although only two claims are involved in this appeal: 1) the DOE did not comply with the NEPA because it failed to prepare and issue an environmental impact statement for public review and comment prior to granting the easement to WAI; and 2) the DOE failed to consult with the Fish and Wildlife Service (FWS) before granting the easement, as required by the ESA.

The parties submitted cross-motions for summary judgment. The district court determined that Sierra Club's allegations were not yet ripe for adjudication. With respect to the allegation that the DOE had failed to comply with the NEPA before issuing a road easement, the court noted

---

1. Pursuant to the rezoning resolutions, WAI is required to meet mandatory requirements to protect the hydrological and ecological resources in the proposed area, including submission of hydrological and tall grass prairie studies and a mine operation plan to Jefferson County for approval. WAI must also post reclamation bonds, and obtain other permits such as an air quality amendment from the Colorado Department of Health, a Colorado mined land reclamation board permit amend-

ment, and a Colorado Department of Transportation highway access permit before it may commence mining operations on all but 20 acres of the new property. WAI has since received the required state air quality permit.

2. At some time following the agreement, WAI transferred its interest in the property's mineral rights to LaFarge Corporation.

that "[t]here is no evidence, however, that the road has been or is being constructed." Aplt. App. at 56. The court further stated:

At this point, WAI's proposed mining operation expansion is merely a potential event with multiple unmet conditions precedent. Undoubtedly, NEPA will require preparation of an EIS if the permitting prerequisites are fulfilled and WAI chooses to proceed with its proposal. Thus, the claimed environmental harms remain "contingent, not certain or immediate."

*Id.* at 57. With regard to Sierra Club's claim that the DOE had failed to consult with the FWS, as required by the ESA, the court stated that, although the Preble's Meadow Jumping Mouse was listed as a "threatened" species under the ESA:

To date … WAI's expansion efforts have been devoted principally to obtaining the necessary county and state permits and approvals. Specifically, county approval is conditioned upon, inter alia, the completion of two five-year hydrological and ecological studies. When and if these studies are completed, Jefferson County then has discretion to modify its zoning approval based on the study results. As a result, the proposed mine expansion remains largely conditional. Because the Mouse population is fluid and subject to myriad events not related to this litigation, the effects of the proposed mining expansion are more accurately assessed when, if ever, WAI's proposal clears its many hurdles.

*Id.* at 58.

Ultimately, the district court concluded that 1) Sierra Club would not suffer significant hardship by the court withholding consideration because Sierra Club would have an opportunity to raise those same claims whenever the licensing process for the mining expansion was completed; 2) intervention would interfere with ongoing procedures; and 3) the issues presented would benefit from further factual consideration, as it was not clear whether the WAI would ever proceed with its proposal, whether the proper licenses would be obtained, whether modifications to the plans would be made, or what environmental risks would ensue from the operations. Therefore, the court found that Sierra Club's claims should be dismissed without prejudice as not ripe for adjudication.

### III.

Sierra Club appeals only the district court's dismissal of its procedural claims which alleged that the DOE failed to comply with the NEPA and ESA in granting the easement. Sierra Club does not appeal the court's dismissal of its other claims against the DOE and the Corps of Engineers.

### *NEPA*

■ Under NEPA, an agency is required to prepare and circulate for review and comment an environmental impact statement before undertaking "legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The agency must prepare a detailed environmental assessment to determine whether the project requires an environmental impact statement. 40 C.F.R. § 1508.9. If an environmental impact statement is prepared, it must detail the environmental impact of the proposed action, any unavoidable adverse environmental effects if the proposal is implemented, alternatives to the proposed action, the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible and irretrievable commitments of resources involved in the pro-

posed action if it is implemented. 42 U.S.C. § 4332(C).

NEPA has twin aims. First, it "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process. Congress in enacting NEPA, however, did not require agencies to elevate environmental concerns over other appropriate considerations. Rather, it required only that the agency take a "hard look" at the environmental consequences before taking a major action.

*Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (internal citations omitted). *See Sierra Club v. Hodel,* 848 F.2d 1068, 1088 (10th Cir.1988).

The DOE determined that neither an environmental assessment nor an environmental impact statement was necessary in this case because the granting of the easement was categorically exempt from full environmental review pursuant to 10 C.F.R. Pt. 1021, subpart D, App. A, as a transfer of property without a change in its use. Sierra Club contends this exemption was improper, and that the DOE was required under NEPA to prepare a full environmental impact statement before granting the easement.

### ESA

The purposes of the ESA are to

provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

16 U.S.C. § 1531(b). The ESA requires each federal agency to confer with the FWS on any agency action that is likely to jeopardize the continued existence of or result in the destruction or adverse modification of critical habitat for any species proposed to be listed as endangered or threatened. 16 U.S.C. § 1536(a). At the conclusion of the consultation, the FWS provides a biological opinion of how the action affects the species or habitat and suggests alternatives. 16 U.S.C. § 1536(b)(3)(A). The DOE did not consult with the FWS before it granted the easement in question. Sierra Club contends the easement is an agency action likely to jeopardize the continued existence or the habitat of the Preble's Meadow Jumping Mouse, thus triggering the consultation requirement of the ESA.

### Ripeness

The ripeness requirement is designed to prevent the courts from "entangling themselves in abstract disagreements over administrative polices, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Lab. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). To determine if an agency's decision is ripe for review, the court examines both the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). In doing so, the court must consider: 1) whether delayed review would cause hardship to the plaintiffs; 2) whether judicial intervention would inappropriately interfere with further administrative action;

and 3) whether the courts would benefit from further factual development of the issues presented.[3] *Id.* The issue of ripeness is reviewed de novo. *Roe No. 2 v. Ogden,* 253 F.3d 1225, 1231 (10th Cir.2001).

█ Sierra Club argues that its claims concerning the failure of the DOE to comply with the NEPA and the ESA before granting the easement are ripe even though no road has been built. In support of this claim it cites *Ohio Forestry,* one of the main cases relied on by the district court in finding a lack of ripeness.

In *Ohio Forestry,* the plaintiff challenged the lawfulness of a federal land and resource management plan adopted for an Ohio forest by the United States Forest Service, arguing that the plan permitted too much logging and clear-cutting. In analyzing the case, the Court noted that while the plan set logging goals, selected areas suited to timber production, and determined which methods of harvesting timber were appropriate, it did not "authorize the cutting of any trees." 523 U.S. at 729, 118 S.Ct. 1665. The Court stated that before the Forestry Service could permit logging under the plan, it was required to propose a specific area where the logging would take place, ensure the project was consistent with the plan, provide those affected by the logging notice an opportunity to be heard, conduct a NEPA environmental analysis, and make a final decision that was subject to administrative review. In addition, the Court noted that the plan itself was subject to future revision. The Court concluded that, under the circumstances, delayed review would not cause

hardship because the plan did not create legal rights or obligations and the Forest Service was required to engage in significant further activity before it could permit logging. The Court also found that entertaining the present challenge would hinder the Forest Service's efforts to refine the plan and to correct its deficiencies, if warranted. Further, the Court found that review at the present juncture would require speculative consideration of the details of the plan without the benefit of a focus on a particular logging proposal. Accordingly, the Court held the challenge was not ripe. However, the Court explicitly distinguished the plaintiff's substantive claim, brought pursuant to the National Forest Management Act, from a procedural claim brought under NEPA, stating that NEPA, unlike the National Forest Management Act, "simply guarantees a particular procedure, not a particular result. *Hence, a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place for the claim can never get riper.*" 523 U.S. at 737, 118 S.Ct. 1665 (emphasis added; internal citations omitted).

█ The emphasized language in *Ohio Forestry* indicates that a challenge to the failure of an agency to comply with the NEPA procedures becomes ripe at the time the failure takes place, assuming the plaintiff has standing to bring the claim. Other circuits have so held. *See Heartwood, Inc. v. U.S. Forest Ser.,* 230 F.3d 947, 952–53 (7th Cir.2000) (finding chal-

---

**3.** We have alternatively expressed a four-factor test to be considered: 1) whether the issues are purely legal; 2) whether the agency action involved is "final agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704; 3) whether the action has or will have a direct and immediate impact upon the plaintiff; and 4) whether

resolution of the issues will promote effective enforcement and administration by the agency. *Coalition for Sustainable Res., Inc. v. United States Forest Serv.,* 259 F.3d 1244, 1250 (10th Cir.2001). We have found this test to be essentially the same as that expressed in *Ohio Forestry. Id.* at 1250, n. 11.

lenge to Forest Service's list of exclusions under NEPA for failing to follow NEPA procedure was ripe notwithstanding the fact that no project had been authorized under any of the proposed exclusions); *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 930–32, n. 14 (9th Cir.2000) (recognizing that unlike a substantive claim challenging the result of NEPA analysis, a procedural claim alleging failure to follow NEPA is ripe when the failure to follow NEPA occurs); *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 51 (D.C.Cir.1999) (holding that a person who is injured by failure to comply with a procedural requirement may complain at the time the failure takes place). We see no reason why a procedural challenge to the failure of a federal agency to comply with the ESA's procedures should not be treated in the same manner.

The DOE argues, and the district court found, that Sierra Club's procedural claims are not ripe because construction of the road cannot proceed without prior approval of the DOE and any construction would be subject to DOE supervision. Thus, according to the DOE, the road may never be built. However, Sierra Club's claims regarding failure of the DOE to comply with NEPA and the ESA do not challenge the building of the road, but rather the granting of the easement. That action has already taken place.

In finding that Sierra Club's claims were not ripe, the district court stated that "the claimed environmental harms remain 'contingent, not certain or immediate.'" Aplt. App. at 57. The district court cited *State of Utah v. United States Dep't of Interior*, 210 F.3d 1193, 1197 (10th Cir.2000), which in turn cited *Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998). However, neither case is applicable to the situation at hand. In *State of Utah*, the State sought to intervene in a contract negotiation between a federally-recognized Indian tribe and a private company in order to protect its environmental interests. We held that the matter was not ripe for adjudication because the Nuclear Regulatory Commission was performing a NEPA analysis and the NEPA procedure would give the State adequate opportunity to raise its concerns. 210 F.3d at 1196–97. *State of Utah* is in sharp contrast to the case at hand, where the issue is the failure of the DOE to conduct an NEPA and ESA analysis before granting the easement. Although the DOE may be required to perform an NEPA and ESA analysis before giving its approval to the construction of a road, that issue is far from certain.

Similarly, the case of *Texas v. United States* is inapplicable. In that case, the Supreme Court was faced with a statutory scheme wherein failing school districts could be subject to sanctions, including the appointment of a master to oversee operations. Concerned that some of the sanctions might violate the Voting Rights Act of 1965, the State sought a declaratory judgment. The Court held the claim was not ripe for adjudication because it rested upon "contingent future events that may not occur as anticipated, or indeed may not occur at all". 523 U.S. at 300, 118 S.Ct. 1257. In contrast, the complained-of action here does not rest on contingent future events, but rather on failure to conduct a NEPA analysis before granting the easement, an event which has already occurred.

■ *Ohio Forestry* establishes that a claim for the alleged failure of the DOE to comply with the NEPA (and presumably the ESA) is ripe at the time of failure, assuming that the plaintiff has standing. *See* 523 U.S. at 737, 118 S.Ct. 1665. Standing requires: 1) "an injury in fact" that is 2) fairly traceable to the challenged

action and 3) likely to be redressed by judicial intervention. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

To establish an injury-in-fact from failure to perform a NEPA analysis, a litigant must show: 1) that in making its decision without following the NEPA's procedures, the agency created an increased risk of actual, threatened or imminent environmental harm; and 2) that this increased risk of environmental harm injures its concrete interest. *Comm. to Save Rio Hondo v. Lucero,* 102 F.3d 445, 449 (10th Cir.1996). In the context of a NEPA claim, the harm itself need not be immediate, as "the federal project complained of may not affect the concrete interest for several years." *See id.* at 449, n. 4.

Sierra Club argues that because the DOE did not comply with the NEPA process, its decision to grant the easement was uninformed, and Sierra Club lost its ability to publicly comment on the increased risks of the whole mining project on the environment of the Buffer Zone. Sierra Club further argues that because the DOE failed to comply with the ESA, it did not make an informed decision to grant the easement with regard to the harm of the whole project on the Preble's Jumping Field Mouse.

To establish an increased risk of environmental injury, Sierra Club does not need to prove that the mining project will surely harm the environment, and that it will go forth because of the easement. *See Comm. to Save Rio Hondo,* 102 F.3d at 452 (holding that "The National Environmental Policy Act was not intended to require the plaintiff to show with certainty, or even with a substantial probability, the results of agency action; those examinations are left to an environmental impact statement"). Sierra Club need only show that, in making its decision without follow-

ing the NEPA and ESA procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm. *See id.* at 449.

Sierra Club has presented sufficient facts to show that the easement granted by the DOE is a necessary step in the construction of a road to advance the expansion of the mining project, which has the potential of harming the environment. This is sufficient to establish an increased risk of environmental harm. Also, Sierra Club has alleged facts sufficient to show that increased risk of environmental harm emanating from the uninformed decision of the DOE to grant the easement affects Sierra Club's "concrete interest." A litigant shows an injury to its concrete interest by demonstrating either a geographical nexus to or actual use of the site of agency action. *Id.* Sierra Club established that its members have worked to protect both the Buffer Zone's wetlands and the "threatened" Preble's Jumping Field Mouse, and have used the area in the Buffer Zone for recreational and educational purposes. As a result, Sierra Club has alleged facts sufficient to establish injury-in-fact emanating from failure of the DOE to perform the procedural reviews under the NEPA and the ESA.

Further, the alleged injury is fairly traceable to the failure of the DOE to conduct an NEPA and ESA analysis. An injury under the NEPA results "not from the agency's decision, but rather from the agency's uninformed decisionmaking." *Id.* at 452.

Finally, the alleged injury is redressable by judicial intervention. Although the DOE argues that the injury is not redressable because it has no power over WAI's mining operations, this argument misses the point. The alleged injury is the potential environmental impact of an un-

informed decision to grant the easement. This injury is redressable by a court order requiring the DOE to undertake an NEPA and ESA analysis in order to better inform itself of the consequences of its decision to grant the easement. Thus, Sierra Club has standing to complain of the DOE's failure to follow the procedural requirements of the NEPA and the ESA.

## IV.

We conclude that Sierra Club's procedural claims alleging that the DOE failed to comply with the NEPA and the ESA in granting the road easement are ripe for adjudication and that Sierra Club has standing to raise those claims. The district court erred in dismissing those claims for lack of ripeness.

Reversed and remanded for further proceedings.