**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 4, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STATE OF UTAH; UTAH SCHOOL
AND INSTITUTIONAL TRUST
LANDS ADMINISTRATION; UTAH
ASSOCIATION OF COUNTIES,

       Plaintiffs–Appellees,

  v.

UNITED STATES DEPARTMENT OF
THE INTERIOR; BUREAU OF LAND
MANAGEMENT; DIRK
KEMPTHORNE, in his official capacity
as Secretary of the Interior;
KATHLEEN CLARKE, Director of
Bureau of Land Management,

       Defendants–Appellees,

SOUTHERN UTAH WILDERNESS
ALLIANCE; THE WILDERNESS
SOCIETY; NEW MEXICO
WILDERNESS ALLIANCE; ARIZONA
WILDERNESS ALLIANCE; FRIENDS
OF NEVADA WILDERNESS;
COLORADO ENVIRONMENTAL
COALITION; NATURAL
RESOURCES DEFENSE COUNCIL;
BIODIVERSITY CONSERVATION
ALLIANCE; CALIFORNIA
WILDERNESS COALITION; IDAHO
CONSERVATION LEAGUE,

       Defendants–Intervenors–
       Appellants.

No. 06-4240

------------------------

INDEPENDENT PETROLEUM
ASSOCIATION OF MOUNTAIN
STATES,

      Amicus Curiae.

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 96-CV-870-DB)**

James S. Angell, Earthjustice, Denver, Colorado (Andrew E. Hartsig, Earthjustice, Denver, Colorado, and Heidi J. McIntosh and Stephen H.M. Bloch, Southern Utah Wilderness Alliance, Salt Lake City, Utah, with him on the briefs), for Defendants–Intervenors–Appellants.

Todd S. Aagaard, Attorney, U.S. Department of Justice Environment & Natural Resources Division, Washington, D.C. (Matthew J. McKeown, Acting Assistant Attorney General, U.S. Department of Justice, Washington, D.C., and Paul B. Smyth, U.S. Department of the Interior, Office of the Solicitor, Washington, D.C., with him on the brief), for Defendants–Appellees.

Constance E. Brooks, C.E. Brooks & Associates P.C., Denver, Colorado (Michael Marinovich, C.E. Brooks & Associates P.C., Denver, Colorado; John W. Andrews, Special Assistant Attorney General for the Utah School and Institutional Trust Lands Administration, Salt Lake City, Utah; and Richard K. Rathbun, Assistant Attorney General and Mark Shurtleff, Attorney General for the State of Utah, Salt Lake City, Utah, with her on the briefs), for Plaintiffs–Appellees.

Andrew Bremmer, Independent Petroleum Association of Mountain States, Denver, Colorado, filed an amicus curiae brief on behalf of the appellees.

Before **LUCERO**, **HARTZ**, and **HOLMES**, Circuit Judges.

- 2 -

**LUCERO**, Circuit Judge.

This case began in 1996 when the State of Utah, the Utah School and Institutional Trust Lands Administration, and the Utah Association of Counties (collectively "Utah") filed suit against the United States Department of the Interior and the Bureau of Land Management (collectively "BLM"), challenging the inventory, classification, and management of certain types of BLM and Utah state trust lands. See generally Utah v. Babbitt, 137 F.3d 1193 (10th Cir. 1998). When Utah and BLM entered into a settlement and sought dismissal of the case a decade later, intervenor Southern Utah Wilderness Alliance and other environmental groups (collectively "SUWA") protested.[1] SUWA challenged the settlement on the basis that, among other things, it binds BLM to an illegal interpretation of its organic act, the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-1785. The district court dismissed SUWA's claims, finding that it lacked subject matter jurisdiction over the dispute because (1) SUWA did not have standing to challenge the settlement, (2) the dispute was

---

[1] The appellant-intervenors are: Southern Utah Wilderness Alliance, The Wilderness Society, New Mexico Wilderness Alliance, Arizona Wilderness Alliance, Friends of Nevada Wilderness, Colorado Environmental Coalition, Natural Resources Defense Council, Biodiversity Conservation Alliance, California Wilderness Coalition, and Idaho Conservation League.

not ripe for adjudication, and (3) there was no final agency action taken with respect to the settlement. SUWA now appeals that dismissal.

We agree with the district court that the federal courts lack jurisdiction over this dispute on ripeness grounds, obviating the need to reach the district court's alternate bases. Because the question of whether the settlement violates FLPMA and other statutes turns primarily on the settlement's meaning, our resolution of the issues presented would be significantly aided by the development of a record illustrating how BLM applies the settlement in the context of specific land management decisions. No such record exists at this stage of the litigation, so SUWA's claims are not ripe for judicial resolution. We therefore affirm the district court's decision that it lacked subject matter jurisdiction over SUWA's claims.

**I**

**A**

Fundamentally, the present dispute involves how BLM should manage lands which have wilderness-like characteristics, but have not yet been designated by Congress as wilderness areas. Congress established a system for the preservation of wilderness with the Wilderness Act of 1964, 16 U.S.C. §§ 1131-1136. Under that statute, wilderness areas are defined as public lands designated by Congress, "where the earth and its community of life are untrammeled by

man" and "where man himself is a visitor and does not remain." § 1131(c).

Specifically, wilderness is an area that

> (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

Id. Once designated by Congress as wilderness, these areas must be managed in a way that preserves their wilderness characteristics. See §§ 1131(a) & 1133(b)-(d). With the passage of FLPMA in 1976, Congress created a unified statutory scheme for the management of all BLM lands, including wilderness, potential wilderness, and nonwilderness.

Included in FLPMA were both general BLM management directives and mechanisms by which Congress and the President, acting in concert, may permanently designate certain BLM lands as protected wilderness. FLPMA requires BLM to "protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values" of public land, and "where appropriate . . . preserve and protect certain public lands in their natural condition." 43 U.S.C. § 1701(a)(8). At the same time, FLPMA instructs BLM to manage lands "in a manner which recognizes the Nation's need

for domestic sources of minerals, food, timber, and fiber from the public lands." § 1701(a)(12).

To achieve its statutory directives, BLM must manage land under its control in accordance with a policy of "multiple use and sustained yield." § 1701(a)(7). In managing lands for "multiple use," BLM must "take into account the long-term needs of future generations for . . . resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." § 1702(c). Under the multiple use requirement, BLM must strike a balance that avoids "permanent impairment of the productivity of the land and the quality of the environment," weighing the "relative values of the resources." Id. "Sustained yield," a distinct management goal, "requires BLM to control depleting uses over time, so as to ensure a high level of valuable uses in the future." Norton v. SUWA, 542 U.S. 55, 58 (2004) (citing § 1702(h)).

Utah's original suit, and SUWA's present intervention, implicate three FLPMA provisions in particular. Two of these provisions, § 201 and § 202, guide the inventory and management of BLM lands in general. See 43 U.S.C. §§ 1711 & 1712. A third, § 603, provides a process for BLM lands to be designated as official wilderness areas. See § 1782. It is the meaning of, and the interplay among, these three statutory sections upon which SUWA's present appeal turns.

- 6 -

FLPMA § 201, the inventory provision, requires BLM to prepare and maintain inventories, on a continuing basis, of all public lands under its control. § 1711. These inventories must account for resource and other values, including the recreation and scenic values of BLM lands, "giving priority to areas of critical environmental concern." § 1711(a). Although the statute does not provide any particular timetable for conducting the inventories, they must be kept current "to reflect changes in conditions and to identify new and emerging resource and other values." Id. The inventories comprise only an informational resource; they do not automatically change BLM's actual management practices. Id.

FLPMA § 202 outlines the procedures for using § 201 inventories to create land management plans. Under § 202, BLM must develop formal land use plans for each area under its control. 43 U.S.C. § 1712. Unless otherwise provided by statute, these plans must implement the principles of multiple use and sustained yield. § 1712(c)(1). Furthermore, in formulating land use plans, BLM must "allow an opportunity for public involvement" by giving the public "adequate notice and opportunity to comment upon and participate in" the plans' formulation. § 1712(f).

While FLPMA § 201 and § 202 apply to the inventory and management of all BLM lands, the third provision at issue, FLPMA § 603, relates specifically to wilderness. This section provides a procedure through which some BLM lands gained permanent protection as designated wilderness areas. § 1782. The process

began with § 201 inventories of all roadless areas of 5,000 acres or more and roadless islands, the only areas eligible for wilderness designation through § 603. See § 1782(a). Based on the results of these inventories, § 603 required the Secretary of the Interior to identify areas having wilderness characteristics and to recommend these identified areas to the President for permanent wilderness protection. Id. Areas eligible for wilderness protection under § 603 are commonly known as "wilderness study areas" ("§ 603 WSAs"). The Secretary had 15 years from the passage of FLPMA in 1976 to identify § 603 WSAs and refer them to the President for consideration as permanent wilderness areas. Id. Upon receiving the Secretary's list of wilderness-eligible areas, FLPMA required the President, in turn, to recommend to Congress within two years which of those areas should be designated as permanent wilderness. § 1782(b).

By § 603's own terms, Congress is not required to act on the President's recommendation within any specific time frame, and to this date has not done so with respect to the vast majority of Utah lands identified as § 603 WSAs. In the meantime, to prevent a § 603 WSA's wilderness characteristics from becoming marred, FLPMA directs BLM to manage these wilderness-eligible areas "in a manner so as not to impair the suitability of such areas for preservation as wilderness . . . ." § 1782(c). In implementing this nonimpairment standard, BLM adopted an Interim Management Policy for Lands Under Wilderness Review ("IMP") in 1979. 43 C.F.R. Ch. II, 44 Fed. Reg. 72014-34. The IMP affects

- 8 -

management of areas that were previously deemed wilderness study areas under the Wilderness Act of 1964, and lands that had been subject to wilderness review but for which the wilderness inventory process had not been completed. Id. Absent Congressional action, the § 603 WSA designation is permanent—BLM must manage WSAs pursuant to the nonimpairment standard "until Congress . . . determine[s] otherwise." 43 U.S.C. § 1782(c).

For the purposes of this lawsuit at least, management of § 603 WSAs under the IMP is noncontroversial. These areas, however, are not the only lands that BLM has maintained under the IMP. In certain cases, the agency has also applied the IMP to areas that have wilderness characteristics, yet do not fit § 603's strict requirements (e.g., they are less than 5,000 acres in size). Although these areas are not "wilderness study areas" as that term is used in § 603, BLM has in the past used its general land-management authority under § 202 to maintain them in a way that does not impair their wilderness characteristics. Consistent with BLM's terminology, we refer to these areas as "§ 202 WSAs."

Both § 202 WSAs and § 603 WSAs have been managed under the IMP, but with some differences. Most significant to this litigation is the permanence of the two designations. Only Congress may end nonimpairment management of a § 603 WSA. See § 1782(c). By contrast, BLM may change the management of a § 202 WSA by modifying the underlying land use plan.

**B**

The present litigation arises from the application of FLPMA to public lands in Utah. Shortly after FLPMA's passage, BLM conducted a § 201 inventory to ascertain which of its Utah lands were eligible for wilderness study. It completed the inventory in 1980. BLM identified approximately 3.2 million acres of § 603 WSAs, and in 1991 the Secretary of the Interior recommended to President George H. W. Bush that of those lands, 1.9 million acres be protected as wilderness. See BLM, U.S. Dep't of Interior, Utah Statewide Wilderness Study Report 3 (1991). President Bush adopted the Secretary's recommendation and in 1993 asked Congress to grant wilderness designation to those 1.9 million acres. Congress has never acted on that recommendation, but BLM continues to manage all 3.2 million acres in accordance with the IMP.

In response to the congressional stalemate over the President's recommendation as well as accusations that the original inventory was underinclusive, in 1996 then Secretary of the Interior Bruce E. Babbitt ordered a new inventory of certain Utah lands. This "reinventory" covered those areas that were the subject of H.R. 1500, 104th Cong. (1995), a bill pending before Congress that would have granted wilderness protection to approximately 5.7 million acres of public lands. In total, the reinventory encompassed all lands included in the pending legislation that were not already designated as § 603 WSAs, equaling approximately 3.1 million acres of federal land and another half-million acres of adjacent Utah trust land. BLM asserted that the reinventory's

purpose was to ascertain the wilderness characteristics of these lands, not to automatically change their management.  <u>Babbitt</u>, 137 F.3d at 1199.

In October 1996, Utah filed suit in the United States District Court for the District of Utah to halt the reinventory process.  Since that time, this suit has followed a complex procedural path.  Utah's original complaint contained eight causes of action, seven of which related to the legality of the 1996 reinventory.  The eighth cause of action was unrelated to the reinventory; it asserted, in essence, that BLM lacked the statutory authority to impose a de facto wilderness management standard on § 202 WSAs.

Although the district court originally granted a preliminary injunction against BLM, a panel of this court vacated the injunction, holding that Utah lacked standing to challenge the reinventory.  <u>Id.</u> at 1214-15.  We nonetheless allowed Utah to move forward with its challenge to the management of § 202 WSAs, concluding that it had presented evidence of standing adequate to survive a motion to dismiss on its eighth cause of action.  <u>Id.</u> at 1215-16.  BLM then resumed the reinventory process, ultimately determining that many of the surveyed areas had wilderness characteristics.

The litigation lay dormant until January 2001 when, in the final weeks of the Clinton administration, BLM adopted a new Wilderness Inventory and Study Procedures Handbook ("WIH").  The 2001 WIH memorialized BLM's view that it had statutory authority to create what it referred to as § 202 WSAs.  It also

memorialized a policy of applying the IMP to those WSAs established through its § 202 land use planning authority.[2] The 2001 WIH provides that "[a]ll WSAs will remain under the IMP until wilderness legislation is enacted by the Congress . . . or the plan establishing the WSA is amended to modify or eliminate the WSA designation."

Utah responded to the WIH in March 2003 by filing an amended complaint against BLM. In the new complaint, Utah challenged BLM's statutory authority to implement the WIH to create § 202 WSAs. It also challenged the application of the IMP to these areas, contending that the policy "unlawfully withdraw[s] these public lands from mineral development and other uses and manage[s] these lands as if they were [WSAs]."

On April 10, 2003, SUWA moved to intervene. The following day, Utah and BLM reached an agreement to end the litigation and filed a Stipulation and Joint Motion seeking an order approving their settlement and dismissal of the

---

[2] It is unclear if the 2001 WIH marked a change of course for BLM or simply a memorialization of then-existing practices within the agency. There is little question, however, that BLM established "WSAs" pursuant to its general § 202 planning authority long before 2001. For example, a 1993 report references "97 WSAs . . . designated under section 202 of FLPMA." U.S. Gen. Accounting Office, Federal Land Management: Status and Uses of Wilderness Study Areas 16 (1993). The WIH explicitly provides certain procedures for addressing lands with wilderness characteristics. For example, when considering any action in such areas, land managers must consider "postponing a decision on the proposed action until the wilderness values can be addressed through a new land use plan or plan amendment."

amended complaint. The stipulation, which the parties originally sought to have the district court enforce as a consent decree, provided:

* * *

3. The authority of Defendants to conduct wilderness reviews, including the establishments of new WSAs, expired no later than October 21, 1993, with submission of the wilderness suitability recommendations to Congress pursuant to [FLPMA] Section 603. As a result, Defendants are without authority to establish Post-603 WSAs, recognizing that nothing herein shall be construed to diminish the Secretary's authority under FLPMA to:
   a. manage a tract of land that has been dedicated to a specific use according to any other provision of law (Section 302(a)),
   b. utilize the criteria in Section 202(c) to develop and revise land use plans, including giving priority to the designation and protection of areas of critical environmental concern (Section 202(c)(3)), or
   c. take any action necessary, by regulation or otherwise, to prevent unnecessary or undue degradation of public lands (Section 302(b)).

4. The 1999 Utah Wilderness Inventory shall not be used to create additional WSAs or manage public lands as if they are or may become WSAs, and the inventory information will be evaluated for its validity and utility at such time as changes are made to the appropriate land use plan . . . .

5. Accordingly, Defendants will rescind the new [2001 WIH] and the [related] direction, decisions, policies and bulletins . . . .

6. The affected [materials] have been issued as guidelines and policies that bind only BLM and, as a result, the change contemplated in this Agreement need not follow Administrative Procedure Act rulemaking procedures or other public notice and comment procedures.

7. Defendants will not establish, manage or otherwise treat public lands, other than Section 603 WSAs and Congressionally

- 13 -

designated wilderness, as WSAs or as wilderness pursuant to the Section 202 process absent congressional authorization. Within 30 days of execution of this Agreement and Stipulation, Defendants will . . . [amend] the notices of intent to prepare an environmental impact study for Utah BLM resource management plans in [certain Utah] Districts to remove any and all references or plans to create additional "WSAs," and to remove any and all references or plans to classify or manage BLM lands (other than the Section 603 WSAs) as if they are or may become WSAs. . . . [N]othing herein is intended to diminish BLM's authority under FLPMA to prepare and maintain on a continuing basis an inventory of all public lands and their resources and other values, as described in FLPMA Section 201. These resources and other values may include, but are not limited to characteristics that are associated with the concept of wilderness.

Prior to ruling on SUWA's motion, the district court granted the parties' motion to dismiss Utah's amended complaint, but it "retain[ed] continuing jurisdiction . . . for purposes of enforcing the terms of the Stipulation . . . ." A flurry of filings by SUWA and the other potential intervenors followed. After the district court granted the motions to intervene, SUWA appealed to this court, seeking to have the consent decree vacated. See Utah v. Norton, 396 F.3d 1281 (10th Cir. 2005). We rejected the appeal as premature because the district court had not yet entered final judgment and returned the matter to the district court. See id. at 1287.[3]

_____

[3] In the meantime, BLM modified several policy guidance documents to reflect the terms of the consent decree. One memorandum issued in late 2003 advised BLM directors that the agency's "authority set forth in [§ 603] to complete the three-part wilderness review process . . . expired on October 21, 1993" and its authority to "designate lands as WSAs for management pursuant to

(continued...)

- 14 -

After SUWA refiled its objections in the district court, the court held a hearing to consider SUWA's motion for temporary vacatur of the consent decree. Citing separation of powers concerns, the district court granted SUWA's request for temporary vacatur on August 8, 2005. A month later, Utah and BLM filed a new agreement ("settlement"). This agreement was identical in substance to the consent decree but purported to be a private settlement that did not require the district court to maintain jurisdiction or enforce its terms. The district court granted their joint motion to dismiss the amended complaint, but also granted SUWA's motion to file amended cross-claims challenging the settlement.

SUWA's amended cross-claims asserted that the settlement violated FLPMA; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4375; and an injunction issued by a district court in Sierra Club v. Watt, 608 F. Supp. 305 (E.D. Cal. 1985). Finding that SUWA lacked Article III standing, that the settlement did not represent a final agency action, and that the issues presented were not ripe for adjudication, the district court dismissed SUWA's

[3](...continued)
the non-impairment standard" had terminated as well. BLM Instruction Memorandum No. 2003-274 at 1-2 (Sept. 29, 2003). Another explained that the policy change was prospective only: "Those lands designated as WSAs in the BLM's land use plans after October 21, 1993, may continue to be managed consistent with the decisions contained in the approved land use plans." BLM Instruction Memorandum No. 2003-275 at 2 (Oct. 23, 2003). Although the establishment of new WSAs was strictly prohibited, "[l]ands with wilderness characteristics may be managed to protect and/or preserve some or all of those characteristics, [which] may include protecting certain lands in their natural condition . . . ." Id. at 3.

cross-claims. In the alternative, the district court rejected each of SUWA's claims on the merits. SUWA appeals from that decision. Our jurisdiction arises under 28 U.S.C. § 1291.

## II

We begin in the same place as the district court and evaluate whether we have jurisdiction over the dispute. Although the district court relied on several jurisdictional doctrines in dismissing SUWA's cross-claims, to resolve this appeal, we need only focus on whether SUWA's claims are ripe for judicial review. "We review the district court's resolution of the ripeness issue de novo." Salt Lake Tribune Publ'g Co. v. Mgmt. Planning, Inc., 454 F.3d 1128, 1140 (10th Cir. 2006) (quotation omitted).

As applied to review of agency actions, the ripeness doctrine has two underlying rationales: preventing courts from becoming entwined in "abstract disagreements over administrative policies," and "protect[ing] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967). We avoid unwarranted entanglement by "examin[ing] both the 'fitness of the issues for judicial decision' and the 'hardship to the parties of withholding court consideration.'" Sierra Club v. U.S. Dep't of Energy, 287 F.3d 1256, 1262 (10th Cir. 2002) (quoting Ohio Forestry

Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998)).  Our analysis accounts for three

factors:

> 1) whether delayed review would cause hardship to the plaintiffs; 2)
> whether judicial intervention would inappropriately interfere with
> further administrative action; and 3) whether the courts would benefit
> from further factual development of the issues presented.

Sierra Club, 287 F.3d at 1262-63 (citing Ohio Forestry, 523 U.S. at 733).[4]

Applying these factors to SUWA's claims, we conclude that this dispute is

not yet ripe for judicial review.

**A**

Because it is the most central consideration in this appeal, we begin with

the third ripeness factor—whether the courts would benefit from further factual

development of the issues advanced.  SUWA argues that this dispute presents

---

[4] The district court used an alternate four-factor test which we have applied in some cases.  See, e.g., Coal. for Sustainable Res., Inc. v. U.S. Forest Serv., 259 F.3d 1244, 1250 (10th Cir. 2001).  The four-factor test considers:

> (1) whether the issues in the case are purely legal; (2) whether the
> agency action involved is "final agency action" within the meaning
> of the Administrative Procedure Act, 5 U.S.C. § 704; (3) whether the
> action has or will have a direct and immediate impact upon the
> plaintiff and (4) whether the resolution of the issues will promote
> effective enforcement and administration by the agency.

Id. at 1250 (citation omitted).  We have previously noted that the two tests are "essentially the same," Sierra Club, 287 F.3d at 1263 n.3, because they "include[] all the same considerations," Coal. for Sustainable Res., Inc., 259 F.3d at 1250 n.11.  We apply the three-factor test recently articulated by the Supreme Court in Ohio Forestry because it concisely captures the pitfalls of adjudicating SUWA's challenge at this premature stage.

purely legal issues, involving abstract questions of whether the settlement

conflicts with various provisions of FLPMA, violates NEPA, and runs afoul of a

mandatory injunction. As such, it maintains that further factual development is

unnecessary to reach the merits of this dispute. Although we agree that SUWA

primarily presents purely legal issues, as we will explain, the resolution of the

questions turns on the practical meaning of the settlement's terms, which the

parties vigorously dispute. At some point, the BLM either will, or will not, apply

the settlement to specific land management decisions in a manner that conflicts

with federal statutes or court orders. On the record before us, this point has not

yet come. Because we cannot confidently say whether BLM's implementation of

the settlement will violate any federal statute without considering its application

in a concrete context, the issues raised by SUWA are not ripe. A brief summary

of SUWA's claims, and BLM's responses,[5] will demonstrate why this is so.

**1**

SUWA first contends that the settlement conflicts with FLPMA § 201. It

maintains that the settlement "explicitly prohibits BLM from conducting

wilderness inventories" because it stipulates that BLM's authority to conduct

wilderness reviews expired in 1993. BLM counters that it does nothing of the

sort. According to the agency, the settlement preserves BLM's full inventory

---

[5] BLM and Utah generally take similar positions regarding the settlement's interpretation. We will note Utah's arguments separately in those relevant instances where the appellees disagree.

authority under § 201 to "gather any information, including information about wilderness-associated characteristics." In order to decide if the settlement violates § 201, we would have to theorize about whether SUWA's interpretation accurately reflects how the settlement will impact BLM inventories—a task that in the absence of a well-developed record would amount to judicial conjecture.

Similar disagreements exist over whether the settlement violates § 202's mandate that BLM manage land consistent with principles of multiple use and sustained yield. SUWA develops a detailed argument that wilderness management is just one form of multiple-use management, and that by forbidding the application of the IMP to areas other than § 603 WSAs, the settlement illegally curtails BLM's § 202 powers. In response, BLM contends that although the settlement forbids designating lands as "WSAs" under § 202, it does nothing to limit BLM's authority to manage lands, including applying policies similar to those in the IMP (if not the IMP itself) to areas other than § 603 WSAs. In order to reach the merits of this claim, we would have to decide which side has the better reading of the settlement. Specifically, is this "really just a disagreement over nomenclature" as BLM would have us accept, or does the settlement require BLM to rule out certain management options in developing land use plans? BLM's application of the settlement in context may well help answer this question.

SUWA raises an additional § 202 argument. It notes that in order to change a land management plan, BLM is required to comply with § 202's land use amendment procedures and prepare a NEPA analysis of the proposed change. BLM did not undertake this process with respect to any lands before entering into the settlement, and SUWA therefore contends that the settlement facilitated a violation of FLPMA's procedural demands. At the root of this argument lies an assumption that the settlement actually changes existing land use plans, including the § 202 WSAs. BLM vehemently disagrees with that assumption, declaring that the settlement does not impact any existing land use plans, including those plans that apply the IMP to established § 202 WSAs. If and when any land management changes occur, BLM states, it will follow the required procedures. Deciding this legal issue requires us to predict how—and even whether—the settlement will affect the management of existing § 202 WSAs.

SUWA also alleges that the settlement represents a new interpretation of FLPMA, and that BLM failed to support the settlement by providing a reasoned analysis. SUWA's position is simple: Prior to the settlement, BLM stated that it could create new § 202 WSAs, and after the settlement the agency claims that it lacks the statutory authority to do so. BLM's main defense is to claim that the settlement is "neither as broad nor as clear as SUWA alleges." The settlement's breadth is open to question, but we agree that it is far from clear. Application of

the settlement in specific contexts would help bridge the gap between these divergent views.

In addition, SUWA charges that the settlement violates NEPA by limiting BLM's options during the land use planning process. Regulations provide that while the NEPA environmental-impact statement process is underway, an agency will take "no action . . . which would . . . [l]imit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a). By removing the option of WSA designation for three pending land use plan revisions in Utah, SUWA reasons that the settlement "commit[s] BLM to ignoring possible WSA designation in the NEPA analyses . . . ." BLM offers two retorts. First, it argues that because FLPMA precludes the agency from creating any WSAs after § 603's 1993 deadline, such a designation is not within BLM's "reasonable alternatives" when considering land use plans. Second, BLM contends that it may still consider all reasonable options under § 202, including land use plans that "would protect wilderness-associated characteristics to an extent equivalent to the non-impairment standard." Utah apparently disagrees with this view, maintaining in their briefs and at oral argument that, after the settlement, BLM may not manage lands exclusively for wilderness values under § 202. As with SUWA's other arguments, this issue turns on the meaning and force of the settlement, which is unclear at this juncture.

Finally, SUWA asserts that the settlement violates a 1985 injunction issued in the Eastern District of California. In <u>Sierra Club v. Watt</u>, environmental groups challenged the Department of the Interior's determination that certain parcels of BLM land smaller than 5,000 acres, were, as a matter of law, erroneously included in a previous list of § 603 WSAs. 608 F. Supp. at 338-39. The district court concluded that although the record could support deletion of the WSAs, it did not agree that this deletion automatically changed the underlying management of those lands, because the agency had not exercised its discretion to explicitly make such a change. <u>Id.</u> at 340-41. The court therefore concluded that the BLM must continue to manage the lands pursuant to the IMP until the applicable land use plans were affirmatively altered. <u>Id.</u> at 342. In its order, the court issued a permanent injunction providing that "[t]he Secretary of Interior shall manage all less than 5,000 acre lands previously [ordered to be managed under the IMP] . . . pursuant to the nonimpairment protocol specified in the WIH and IMP for potential inclusion as WSA's <u>unless and until</u> the Secretary exercises his discretion in a manner permitted by law to change that status . . . ." <u>Id.</u> at 344 (emphasis added). SUWA contends in the instant appeal that the settlement violates this injunction because the settlement states that BLM must "refrain from applying the IMP . . . to BLM lands other than Section 603 WSAs."

Like SUWA's claim that the settlement changes the management of existing § 202 WSAs, this argument relies on the baseline assumption that the

settlement has retroactive force. If the settlement and the resulting policy guidance truly changed the management of the areas covered by the Watts injunction, SUWA might have a tenable argument. But BLM, citing the instructional memoranda it issued following the settlement, insists that the settlement does not change or disestablish any existing classifications, and that any future changes would result only from an exercise of lawful discretion to modify the land use plan, an action permitted by the injunction. Once again, the question of whether the settlement violates the injunction can only be resolved once we know whether BLM interprets the settlement to apply retroactively. Nothing in the undeveloped record indicates that this would be the case.

**2**

Thus, while we agree with SUWA that its claims largely present legal issues, this does not mean that these claims are ripe for review. See C.S.G. Exploration Co. v. FERC, 930 F.2d 1477, 1485 (10th Cir. 1991). Resolution of these legal disputes turns, in each instance, on questions of whether the settlement, as implemented, will actually prove illegal. As we have explained, SUWA and BLM disagree at a minimum on: (1) whether the settlement precludes "wilderness inventories" (or, inventories for wilderness characteristics); (2) whether BLM retains discretion to manage lands under the multiple-use mandate in a manner equivalent, for all relevant purposes, to the IMP; (3) whether the settlement constrains BLM's consideration of reasonable alternatives when

developing land use plans; and (4) whether the settlement applies retroactively to lands already classified as § 202 WSAs and managed pursuant to the IMP. In short, SUWA urges that the settlement will have broad-ranging practical effects that violate the statutory scheme. BLM, meanwhile, would have us accept that this dispute is fundamentally about terminology, that the settlement preserves its authority and discretion, and that it will follow FLPMA and other federal laws in the future regardless of the settlement's provisos. These abstract disagreements on threshold issues will likely narrow with further factual development. See Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 812 (2003).

It is true that we could study the language of the settlement and hazard a guess as to which of the parties has the better view of the settlement's eventual impact. But the settlement is manifestly vague regarding how BLM can or should make specific land management decisions, and the ripeness doctrine exists precisely for the purpose of preventing unnecessary adjudication under such circumstances. We could therefore resolve the issues in this case more confidently with the benefit of insight into how BLM actually implements the settlement in practice.

Unfortunately, the record at this stage contains little in the way of evidence regarding how BLM will implement the settlement. SUWA cites to a few BLM

publications interpreting the settlement in various ways,[6] but these documents are insufficient to resolve the debate over the settlement's ultimate impact. SUWA also presents evidence that BLM was contemplating creating § 202 WSAs in certain land use plans under consideration at the time of the settlement, but claims that BLM might no longer consider this designation after the settlement. This speculation does not resolve whether BLM will evaluate its options any differently than it did before the settlement. Even before the settlement, BLM noted that although the disputed areas may be "inventor[ied] . . . for wilderness values" at the land manager's discretion, "[t]he actual designation is discretionary . . . ." As we have recounted above, BLM maintains that even after the settlement, it may inventory lands for wilderness values and manage them in a way that protects those values.

Only after the settlement is applied to the development of <u>specific land use plans</u> will the true effect of the agreement become clear.[7] We would therefore

_____

[6] For example, the record contains a Power Point presentation in which BLM employees have represented that the agency will not complete future wilderness inventories. SUWA also offers a 2005 BLM Budget Justification stating that "formal wilderness inventories will no longer be completed in 2005" yet, at the same time, representing that BLM will "complete[] assessments or evaluations to document wilderness resources."

[7] SUWA's own approach to this appeal reinforces our sense that the important issues presented in this dispute can be resolved more accurately once BLM has implemented the settlement on the ground and a record has been developed accordingly. Among the several "supplemental authority" letters SUWA has submitted pursuant to Federal Rule of Appellate Procedure 28(j),

(continued...)

- 25 -

"stand on much surer footing in the context of a specific application of [the settlement] than could be the case in the framework of the generalized challenge made here." Toilet Goods Ass'n, Inc. v. Gardner, 387 U.S. 158, 164 (1967). As we have previously concluded, when pressed to decide whether agency policies which have not yet been implemented conflict with statutory directives, judicial review must wait until the BLM settlement is applied in a specific context. See C.S.G. Exploration Co., 930 F.2d at 1485.

## B

We consider next whether reaching the merits of SUWA's challenge would inappropriately interfere with further administrative action. We conclude that adjudicating the issues in this appeal at this juncture would, to some degree, preempt BLM's ability to implement the settlement in a manner consistent with its organic statutes. It is true that BLM has already issued some policy guidance and instructions based on its interpretation of the settlement. But as discussed,

---

[7](...continued)
some relate to BLM's implementation and interpretation of the settlement. Helpful as some of this information might be, it still falls short of resolving how the settlement will be applied in context.

In addition, the information submitted is not truly supplemental authority under Rule 28(j) but rather new evidence, and new evidence not submitted to the district court is not properly part of the record on appeal. See DiBella v. Hopkins, 403 F.3d 102, 118 (2d Cir. 2005) (recognizing that "[Rule 28(j)] cannot be used to submit new evidence to the appeals court" (emphasis in original)); Trans-Sterling, Inc. v. Bible, 804 F.2d 525, 528 (9th Cir. 1986) ("Rule 28(j) permits a party to bring new authorities to the attention of the court; it is not designed to bring new evidence through the back door" (emphasis in original)).

BLM must follow the procedures established in FLPMA and NEPA before these preliminary and high-level interpretations actually affect any specific land management plans, and it remains unclear what effect they might have. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (quotation omitted). This is precisely the situation before us. If we were to hold on the merits that the settlement, as SUWA reads it, violates FLPMA or NEPA, we would be resolving a nullity if further administrative action would have afforded the settlement a less dire interpretation.[8]

In marked contrast to this case stands Rocky Mountain Oil & Gas Ass'n v. Watt, 696 F.2d 734 (10th Cir. 1982), in which we held that a challenge to BLM's interpretation of § 603's nonimpairment standard was ripe for adjudication. Id. at 740-42. We emphasized in Rocky Mountain that although the plaintiffs challenged an abstract BLM opinion, the opinion had already led to a revised IMP and that IMP, in turn, had already caused the denial of numerous applications for drilling permits in WSAs. Id. at 741. Therefore, little risk existed that judicial

_____

[8] Although BLM and Utah jointly defend the settlement against SUWA's intervention, they apparently disagree about whether it constitutes a final agency action. Utah insists that "the Settlement is a final decision," while BLM insists that the settlement "does not impose legal obligations on BLM."

resolution of that dispute would have prematurely interfered with agency decisionmaking.

Unlike Rocky Mountain, the record here leaves substantial doubt as to if, when, and how the settlement will affect the management of any specific BLM lands. As BLM asserts, "it is not clear that the settlement will change BLM's land management decisions at all." Only time—and further administrative action—will tell. Because the settlement's impact "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all," Texas, 523 U.S. at 300, it is not ripe for review.

## C

On the other side of the balance, we consider whether delayed review would cause hardship to SUWA or any other parties to the appeal. From a practical standpoint, the settlement is a number of steps removed from the actual implementation of any land use plan that might threaten the wilderness values of a potential § 202 WSA. Even if the settlement actually binds BLM's management decisions (and BLM insists that it does not), a long and winding path through policy guidance, NEPA analysis, and the § 202 land use planning process must occur before the settlement's interpretation of FLPMA might actually threaten the interests of SUWA's members. See Quest Comm'ns Int'l, Inc. v. FCC, 240 F.3d 886, 894 (10th Cir. 2001) (holding that the hardship component was unsatisfied

because the challenged administrative orders would not have a "direct and immediate impact" upon the plaintiff until other contingent steps occurred).

Nor has SUWA offered much evidence or argument that delayed review will cause hardship. SUWA does present declarations from several individuals who state that BLM's actions will compromise the wilderness values of specific BLM lands.[9] Although these declarations give us some pause, the allegations contained therein provide little detail regarding how exactly the settlement, as opposed to BLM's discretionary actions, might threaten the wilderness values of these lands. For example, Roy Bloxham's declaration generally charges that BLM has failed to comply with NEPA and the National Historic Preservation Act in considering protests to leases of public lands in Utah, but does not expound upon BLM's specific failings or explain how these shortcomings resulted from the settlement. Similarly, Suzanne Jones maintains that although BLM reinventoried Bangs Canyon (located in western Colorado) for wilderness values in 1999 and had planned to consider revising its management plan to protect those values, it never actually amended the plan and refused to consider WSA status as a result of the settlement. Consequently, new roads might be constructed in the area. Jones' declaration alleges only that BLM has thus far declined to modify an existing

_____

[9] SUWA moved to file additional declarations in the district court after the court heard argument, but the district court never ruled on the motion and SUWA has not moved to supplement the record on appeal. These declarations are therefore not properly before us, but even if they were, they would not affect our view of the dispute. See Cosco v. Uphoff, 195 F.3d 1221, 1225 (10th Cir. 1999).

management plan, however, so it is unclear whether the settlement will be responsible for any future harm, even if it does occur. Moreover, because BLM insists that it continues to consider options other than formal WSA designation to protect wilderness values under § 202, it is far from clear that a decision in SUWA's favor in this appeal would necessarily address the potential harm that Jones identifies.

By contrast to these abstract threats, the cases where we have afforded significant weight to the hardship element generally fall into one of two categories. In one set of cases, the parties would have faced significant costs, financial or otherwise, if their disputes were deemed unripe for adjudication. See, e.g., Rocky Mountain, 696 F.2d at 741-42; Skull Valley, 376 F.3d at 1237-39; Roe No. 2 v. Ogden, 253 F.3d 1225, 1231 (10th Cir. 2001) (concluding that delayed review would cause hardship to plaintiffs by placing their legal careers on hold). In others, the defendant had taken some concrete action that threatened to impair—or had already impaired—the plaintiffs' interests. See, e.g., Sierra Club, 287 F.3d at 1264-65 (holding matter ripe when the Department of Energy had already granted an easement, allegedly without following NEPA procedures).[10]

_____

[10] In Sierra Club, we recognized that the failure to conduct a NEPA analysis, standing alone, may establish a procedural harm adequate to satisfy the ripeness inquiry (so long as the plaintiff also has standing). 287 F.3d at 1264 (citing Ohio Forestry, 523 U.S. at 737). But there is an ocean of difference

(continued...)

Before us, SUWA only alleges that if BLM interprets the settlement in the way it fears, the settlement may, at some point in the future, affect the management of lands with wilderness values. These "claimed harms are contingent, not certain or immediate." Utah v. U.S. Dep't of the Interior, 210 F.3d 1193, 1197-98 (10th Cir. 2003) (citation omitted). On balance then, the potential hardship to SUWA from delaying adjudication of this case is minimal and speculative. By contrast, allowing this controversy to ripen will have tangible benefits to judicial economy and significantly increase the likelihood of reaching the correct result. With further factual development, the courts will be better positioned to definitively decide whether BLM's actions violate any statute or judicial injunction.

### III

For the reasons set forth, we **AFFIRM** the district court's dismissal of SUWA's cross-claims because they are not ripe for adjudication.

---

[10](...continued)
between the procedural harm alleged in that case and SUWA's NEPA argument in this dispute. The Sierra Club plaintiffs contended that the Department of Energy had taken a specific action—the granting of an easement—without following the proper statutory procedures. Id. SUWA's claim here is far more general. Although it charges that BLM has changed existing land management without following NEPA and FLPMA's procedural requirements, SUWA does not premise its claims on any specific incident of such a procedural failing.