**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 21, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STATE OF WYOMING; STATE OF
COLORADO; INDEPENDENT
PETROLEUM ASSOCIATION OF
AMERICA; WESTERN ENERGY
ALLIANCE,

       Petitioners - Appellees,

and

STATE OF NORTH DAKOTA;
STATE OF UTAH; UTE INDIAN
TRIBE,

       Intervenors Petitioners -
       Appellees,

v.

RYAN ZINKE, Secretary, United
States Department of the Interior;
UNITED STATES BUREAU OF
LAND MANAGEMENT; UNITED
STATES DEPARTMENT OF THE
INTERIOR; KRISTIN BAIL,

       Respondents - Appellants,

and

SIERRA CLUB; EARTHWORKS;
WESTERN RESOURCE
ADVOCATES; CONSERVATION
COLORADO EDUCATION FUND;
WILDERNESS SOCIETY;

No. 16-8068

SOUTHERN UTAH WILDERNESS
ALLIANCE,

       Intervenors Respondents,

-----------------------------

UNITED STATES CHAMBER OF
COMMERCE; PETROLEUM
ASSOCIATION OF WYOMING,
FORMER OFFICIALS OF THE U.S.
DEPARTMENT OF THE INTERIOR;
INTERESTED PUBLIC LANDS,
NATURAL RESOURCES, ENERGY,
and ADMINISTRATIVE LAW
PROFESSORS; PETROLEUM
ASSOCIATION OF WYOMING,
PACIFIC LEGAL FOUNDATION;
WYOMING LIBERTY GROUP,
STATE OF MONTANA; STATE OF
ALASKA; STATE OF KANSAS;
STATE OF TEXAS,

       Amici Curiae.
_____

STATE OF WYOMING; STATE OF
COLORADO; INDEPENDENT
PETROLEUM ASSOCIATION OF
AMERICA; WESTERN ENERGY
ALLIANCE,

       Petitioners - Appellees,

and

STATE OF NORTH DAKOTA;
STATE OF UTAH; UTE INDIAN
TRIBE,

       Intervenors Petitioners -
       Appellees,

v.

SIERRA CLUB; EARTHWORKS; WESTERN RESOURCE ADVOCATES; CONSERVATION COLORADO EDUCATION FUND; WILDERNESS SOCIETY; SOUTHERN UTAH WILDERNESS ALLIANCE,

      Intervenors Respondents - Appellants,

and

RYAN ZINKE, Secretary, United States Department of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; UNITED STATES DEPARTMENT OF THE INTERIOR; KRISTIN BAIL,

      Respondents.

------------------------------

UNITED STATES CHAMBER OF COMMERCE; PETROLEUM ASSOCIATION OF WYOMING, FORMER OFFICIALS OF THE U.S. DEPARTMENT OF THE INTERIOR; INTERESTED PUBLIC LANDS, NATURAL RESOURCES, ENERGY, and ADMINISTRATIVE LAW PROFESSORS; PETROLEUM ASSOCIATION OF WYOMING, PACIFIC LEGAL FOUNDATION; WYOMING LIBERTY GROUP, STATE OF MONTANA; STATE OF ALASKA; STATE OF KANSAS; STATE OF TEXAS,

      Amici Curiae.

No. 16-8069

Andrew C. Mergen, United States Department of Justice, Washington, DC (Jeffrey H. Wood, Acting Assistant Attorney General, William E. Gerard, David A. Carson, Nicholas A. Dimascio, and J. David Gunter II, United States Department of Justice, Environmental and Natural Resources Division, Denver, Colorado and Washington, DC; and Richard McNeer, Office of the Solicitor, United States Department of the Interior, Washington, DC, with him on the briefs), appearing for Appellants United States Bureau of Land Management, United States Department of the Interior, Kristin Bail, and Ryan Zinke.

Michael S. Freeman, Earthjustice, Denver, Colorado (Joel Minor, Earthjustice, Denver, Colorado, and Nathan Matthews, Sierra Club, Oakland, California, with him on the briefs), appearing for Intervenor-Respondent-Appellants Sierra Club, Earthworks, Western Resource Advocates, Conservation Colorado Education Fund, Wilderness Society, and Southern Utah Wilderness Alliance.

James Kaste, Deputy Attorney General,Wyoming Attorney General's Office, Cheyenne, Wyoming (Peter K. Michael, Wyoming Attorney General, Michael J. McGrady, Senior Assistant Attorney General, and Erik Petersen, Senior Assistant Attorney General, Wyoming Attorney General's Office, Cheyenne, Wyoming; Sean D. Reyes, Utah Attorney General, Tyler Green, Solicitor General, Stanford E. Purser, Deputy Solicitor General, Steven F. Alder and Melissa Reynolds, Assistant Attorneys General, Utah Attorney General's Office, Salt Lake City, Utah; Frederick R. Yarger, Solicitor General, Colorado Attorney General's Office, Denver, Colorado, with him on the brief), appearing for Appellees State of Wyoming, State of Utah, and State of Colorado.

Paul M. Seby, Special Assistant Attorney General, Greenberg Traurig, Denver, Colorado; (Wayne K. Stenehjem, Attorney General, and Matthew A. Sagsveen, Assistant Attorney General, Office of the Attorney General for the State of North Dakota, Bismarck, North Dakota, with him on the briefs), appearing for Intervenor-Appellee State of North Dakota.

Mark S. Barron (L. Poe Leggette and Alexander K. Obrecht, with him on the briefs), Baker & Hostetler, Denver, Colorado, appearing for Petitioners-Appellees Independent Petroleum Association of America and Western Energy Alliance.

Jeffrey S. Rasmussen (Jeremy J. Patterson and Rebecca Sher, with him on the brief), Fredericks Peebles & Morgan, LLP, Louisville, Colorado, appearing for Appellee Ute Indian Tribe of the Uintah and Ouray Reservation.

Kevin J. Lynch and Brad Bartlett, Sturm College of Law, University of Denver, Denver, Colorado, filed an amicus curiae brief for Interested Public Lands, Natural Resources, Energy, and Administrative Law Professors.

Susannah L. Weaver and Sean H. Donahue, Donahue & Goldberg, LLP, Washington, DC, filed an amicus curiae brief for former officials of the U.S. Department of the Interior.

Jaimie N. Cavanaugh and Steven J. Lechner, Mountain States Legal Foundation, Lakewood, Colorado, filed an amicus curiae brief for Petroleum Association of Wyoming.

M. Reed Hopper and Jonathan Wood, Pacific Legal Foundation, Sacramento, California, filed an amicus curiae brief for Wyoming Liberty Group.

Timothy C. Fox, Attorney General for the State of Montana, and Tommy H. Butler, Deputy Attorney General for the State of Montana, Helena, Montana; Jahna M. Lindemuth, Attorney General of the State of Alaska, Juneau, Alaska; Derek Schmidt, Attorney General for the State of Kansas, Topeka, Kansas; Ken Paxton, Attorney General for the State of Texas, Austin, Texas, filed an amicus curiae brief for the States of Montana, Alaska, Kansas, and Texas.

Steven P. Lehotsky and Sheldon B. Gilbert, United States Chamber Litigation Center; Jonathan S. Franklin, Norton Rose Fulbright US LLP, Washington, DC, filed an amicus curiae brief for United States Chamber of Commerce.

---

Before **BRISCOE**, **HARTZ**, and **HOLMES**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

In these cases, we are asked to decide whether the Bureau of Land Management (BLM) acted beyond its statutory authority when it promulgated a

1

regulation—43 C.F.R. § 3162.3-3 (2015)[1]—governing hydraulic fracturing (fracking) on lands owned or held in trust by the United States. The district court invalidated this regulation (hereinafter, the Fracking Regulation) as exceeding the BLM's statutory authority. While these appeals were pending, a new President of the United States was elected. After that change in Administration, and at the President's direction, the BLM began the process of rescinding the Fracking Regulation. Given these changed and changing circumstances, we conclude these appeals are prudentially unripe. As a result, we dismiss these appeals and remand with directions to vacate the district court's opinion and dismiss the action without prejudice.

## I

## A

Fracking is a "well stimulation" technique that oil and gas producers use to extract greater volumes of oil and natural gas than is otherwise possible. During fracking, "oil and gas producers inject water, sand, and certain chemicals into tight-rock formations to create fissures in the rock that allow oil and gas to escape for collection in a well." Industry Petitioners Aple. Br. at 2. Chemicals are added in the injection process to delay pipe corrosion and kill unwanted bacteria,

---

[1] Although the parties and this opinion refer to the contested regulation in the singular, two regulations are implicated. The BLM added § 3162.3-3 but also revised § 3162.3-2, the existing regulations governing fracking. Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands, 80 Fed. Reg. 16,128, 16,137 (Mar. 26, 2015).

as well as for other purposes.  Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands, 80 Fed. Reg. 16,128, 16,131 (Mar. 26, 2015).

Although first used by the oil and gas industry in the 1940s, fracking became more effective and complex around 2000 once industry combined fracking with horizontal drilling.  "A horizontally drilled well starts as a vertical or directional well, but then curves and becomes horizontal, or nearly so, allowing the wellbore [i.e., drilled hole] to follow within a rock stratum for significant distances and thus greatly increase the volume of a reservoir opened by the wellbore."  Aplt. App. at 43.  Today, ninety percent of the oil and gas wells on federal lands involve the use of hydraulic fracking.

In 1982, the Department of Interior (DOI) promulgated the predecessor to the Fracking Regulation.  The predecessor regulation governed "the exploration, development, and production of oil and gas from onshore Federal and restricted Indian leases."  See generally Oil and Gas Operating Regulations, 47 Fed. Reg. 47,758 (Oct. 27, 1982) (codified at 30 C.F.R. Part 221).  The 1982 regulation did not address hydraulic fracking in great detail.  Under that regulation, the BLM had to approve only "nonroutine fracturing jobs," but, in practice, industry treated all fracking as routine and rarely sought BLM approval.  The BLM last revised the predecessor regulation in 1988.  See generally Minerals Management, 53 Fed. Reg. 22,814 (June 17, 1988) (codified at 43 C.F.R. Part 3000, et. seq.).

As fracking became more common, public concern increased about whether

fracking was contributing to or causing "contamination of underground water sources, whether the chemicals used in [fracking] should be disclosed to the public, and whether there [wa]s adequate management of well integrity and the 'flowback' fluids that return to the surface during and after [fracking] operations." Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands; Rescission of a 2015 Rule, 82 Fed. Reg. 34,464 (July 25, 2017). The BLM responded by preparing to draft the current regulation in 2010. Oil and Gas, 80 Fed. Reg. at 16,131. The new regulation attempted to modernize the existing federal regulations governing fracking on lands owned or held in trust by the United States by increasing disclosure of the chemicals used in fracking fluid, updating the standards for wellbore construction and testing, and addressing the management of water used in the fracking process. Oil and Gas; Well Stimulation, Including Hydraulic Fracturing, on Federal and Indian Lands, 77 Fed. Reg. 27,691–92,  (May 11, 2012) (discussing the proposed regulation).

On May 11, 2012, the BLM published its proposed regulation. As part of its rulemaking, the BLM alleges it met with affected Indian tribes on at least four occasions from 2012 to 2014. At the public commenters' request, the BLM extended the comment period for 60 days and received over 177,000 comments on the first draft of the proposed regulation. Oil and Gas, 80 Fed. Reg. at 16,131. It published a revised regulation on May 24, 2013 and received another 1.35 million comments on this revised version. Id. The BLM published the final version of

4

the Fracking Regulation on March 26, 2015 with an effective date of June 24, 2015.

The Fracking Regulation attempts to regulate fracking in four ways. It imposes new well construction and testing requirements, new flowback storage requirements (tanks, not pits), new chemical disclosure requirements, and also generally increases BLM's oversight of fracking. The estimated cost to comply with the Fracking Regulation is "about $11,400 per well, or about $32 million per year. On average this equates to approximately 0.13 to 0.21 percent of the cost of drilling a well." Id. at 16,130. The Fracking Regulation would impact an estimated 2,800–3,800 fracking operations per year. Id. Although the Fracking Regulation expands the scope of federal regulation of fracking, most fracking regulation occurs at the state level. However, state regulation of fracking is relatively recent; before 2005, few States had fracking laws.

B

On March 20, 2015, shortly before the Fracking Regulation was to take effect, the Independent Petroleum Association of America (IPAA) and the Western Energy Alliance (WEA) (together: Industry Petitioners) filed a Petition for Review of Final Agency Action under the Administrative Procedure Act (APA) (No. 2:15-cv-00041-SWS). The States of Wyoming and Colorado filed separate Petitions six days later (No. 2:15-cv-00043-SWS). The district court consolidated these cases. North Dakota, Utah, and the Ute Indian Tribe

5

intervened, opposing the new regulation; multiple citizen groups also intervened, defending the regulation (Citizen Group Intervenors).

The Petitions for Review asserted that the Fracking Regulation violated two provisions of the APA: Petitioners alleged the Fracking Regulation was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A), and also was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under § 706(2)(C). The Ute Tribe also raised separate, tribe-specific arguments.

Petitioners individually filed preliminary injunction motions. After a hearing on these motions, the district court postponed the effective date of the Fracking Regulation on the same day it was to take effect, pending the district court's resolution of the preliminary injunction motion. On September 30, 2015, the district court granted the requested preliminary injunction. The court reasoned that Petitioners were likely to succeed on the merits on both APA grounds raised. The BLM and Citizen Group Intervenors both appealed the grant of the preliminary injunction to this court (Nos. 15-8126 and 15-8134).

While those appeals were pending, the district court reached the merits and entered a judgment on June 21, 2016 setting aside the Fracking Regulation. The district court invalidated the Fracking Regulation under § 706(2)(C) of the APA, concluding the BLM had acted beyond its statutory authority. Applying the two-step review set forth in Chevron U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837

6

(1984), the district court concluded that no statute authorized the BLM, or any other federal agency, to regulate fracking. The court addressed each statute the BLM cited in support of its rulemaking authority—the Federal Land Policy Management Act (FLPMA), the Mineral Leasing Act (MLA), the Indian Mineral Leasing Act (IMLA), and the Indian Mineral Development Act (IMDA)—and concluded none of these acts delegated authority to the BLM to promulgate the Fracking Regulation. Wyoming v. United States DOI, Nos. 2:15-CV-041-SWS, 2:15-CV-043-SWS, 2016 WL 3509415, at *3–*10 (D. Wyo. June 21, 2016). The court concluded that the MLA authorized the Secretary of the Interior to regulate activities that disturb the surface of federal lands, but that the Fracking Regulation purports to regulate the fracking process beyond any surface activities. It also found that neither the FLPMA (the BLM's organic act), the IMLA, nor the IMDA give the BLM authority to regulate fracking because none of the Acts contain a specific statutory provision that authorizes the Bureau to regulate fracking, or any kind of underground injection. The district court categorized the FLPMA as a land use planning statute that authorized the BLM, at most, to generate high-level land use planning documents to prevent unnecessary degradation of federal lands.

Even if these Acts could be read to authorize the BLM's regulation of fracking, the district court reasoned that a 2005 amendment to the Safe Drinking Water Act (SDWA) precluded all federal regulation of non-diesel fracking. The

7

SDWA is a comprehensive regime protecting America's drinking water. In particular, it protects "public water systems" and underground water sources. See 42 U.S.C. §§ 300g et seq., 300h et seq. (respectively). The goals of the SDWA are achieved through cooperative federalism. The Environmental Protection Agency (EPA) sets national minimum standards, but the States implement those standards. See id. §§ 300f(7)-(8), 300g-2 (providing for State regulation satisfying a national standard). Section 300h-300h-8 of the SDWA (also called Part C) describes the underground injection program. As set forth in the SDWA, the EPA cannot directly regulate underground injections; it can only recommend that a State do so. Id. § 300h-1(a). States may regulate underground injections of any substance, including garbage and waste. See H.R. 93-1185 (1974). In 2005, Congress excluded non-diesel fracking from the definition of "underground injection." Energy Policy Act of 2005, 109 P.L. 58, 119 Stat. 594 (2005) (codified at 42 U.S.C. § 300h(d)(1)(B)(ii)). This amendment to the SDWA came after a ruling of the Eleventh Circuit, which held that the EPA had authority to regulate fracking under the statute as then written. See Legal Envtl. Assistance Found. (LEAF), Inc. v. EPA, 118 F.3d 1467, 1470 (11th Cir. 1997). In the cases before us, the district court concluded that the 2005 amendment removed the last source of authority for the federal regulation of fracking. According to the district court, after the 2005 amendment to the SDWA, only the States could regulate fracking.

8

Given the district court's ruling that the BLM lacked statutory authority to promulgate the Fracking Regulation, it declined to address whether the BLM's actions in promulgating the Fracking Regulation were arbitrary and capricious in violation of § 706(2)(A) of the APA. As a result of the timing of the district court's rulings, the Fracking Regulation has never taken effect.

After the district court ruled on the merits, we dismissed the preliminary injunction appeals as moot. The parties supporting the regulation brought the instant appeals, challenging the district court's June 21, 2016 Order.

While these appeals were pending, the BLM asked this court to hold these appeals in abeyance pending its pursuit of further rulemaking pertaining to the Fracking Regulation. The BLM explained that President Trump's Executive Order No. 13,771 (January 30, 2017) required the DOI to review its regulations, including the Fracking Regulation, "for consistency with the policies and priorities of the new Administration." Fed. Aplt. Mot. at 2, Mar. 15, 2017. The President issued another Executive Order, No. 13,783, directing the Secretary of the Interior "as soon as practicable," to "publish for notice and comment proposed rules suspending, revising, or rescinding" the Fracking Regulation at issue in these appeals. Id. §§ 7(a), (b)(I) (Mar. 28, 2017). Secretary of the Interior, Ryan Zinke, later clarified, in Order No. 3349 dated March 29, 2017, that the BLM would rescind the regulation in full: "BLM shall proceed expeditiously with proposing to rescind the final rule entitled, 'Oil and Gas; Hydraulic Fracturing on

9

Federal and Indian Lands.'" Id. at § 5(c)(i). On June 22, 2017, the BLM published a notice in the Federal Register reinforcing that commitment: "BLM will proceed expeditiously with a proposed rule to rescind the final rule entitled 'Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands,' 80 FR 16128 (March 26, 2015)." Evaluation of Existing Regulations, 82 Fed. Reg. at 28,431. Then, on July 25, 2017, the BLM published a Notice in the Federal Register opening the 60-day notice and comment period for a proposed rule that would entirely rescind the Fracking Regulation. Rescission of a 2015 Rule, 82 Fed. Reg. at 34,464. The comment period is presently scheduled to close on September 25, 2017. In its notice, the BLM states that "[u]pon further review of the 2015 final rule [Fracking Regulation], as directed by Executive Order No. 13,783 and Secretarial Order No. 3349, the BLM believes that the 2015 [Fracking Regulation] unnecessarily burdens industry with compliance costs and information requirements that are duplicative of regulatory programs of many states and some tribes. As a result, we are proposing to rescind, in its entirety, the 2015 [Fracking Regulation]." Id. at 34,464–65.

## II

The single merits issue addressed by the district court and at issue in these pending appeals is: whether the FLPMA, MLA, and the Indian mineral statutes, read in light of the SDWA, provide the BLM with authority to regulate fracking on lands owned or held in trust by the United States and thereby to promulgate

10

the Fracking Regulation. Given the recent rulemaking activity undertaken by the BLM, however, we must first address whether we should proceed to the merits.

A

The Supreme Court has "recent[ly] reaffirm[ed] the principle that 'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'" Lexmark Int'l, Inc. v. Static Control Components, Inc., __U.S.__, 134 S. Ct. 1377, 1386 (2014) (quotations omitted) (quoting Sprint Commc'ns, Inc. v. Jacobs, __U.S.__, 134 S. Ct. 584, 591 (2013) in turn quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976)). Yet the prudential ripeness doctrine contemplates that there will be instances when the exercise of Article III jurisdiction is unwise. The Supreme Court has long held the ripeness doctrine is "designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" Nat'l Park Hosp. Ass'n v. DOI, 538 U.S. 803, 807–08 (2003) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148–49 (1967) (abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 105 (1977))). Prudential ripeness acknowledges that the constraints of Article III may be insufficient to prevent the consideration of "abstract disagreements over administrative policies." Id. Declining to exercise Article III jurisdiction is

11

unusual but not unprecedented.

B

We ask, then, whether these appeals fall within our obligation to "hear and decide," or whether we should abstain from the exercise of our jurisdiction because these appeals are prudentially unripe?  We analyze prudential ripeness by evaluating "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  Abbott Labs., 387 U.S. at 149.

(1) Fitness for review

With respect to this question, we consider a number of factors, such as whether the issue is a purely legal one, whether the agency decision in dispute was final, and whether "further factual development would 'significantly advance our ability to deal with the legal issues presented.'"  Nat'l Park Hosp. Ass'n, 538 U.S. at 812 (quoting Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 82 (1978)).[2]  We have also considered "'whether judicial intervention would inappropriately interfere with further administrative action' and 'whether the courts would benefit from further factual development of the

---

[2] "We have also articulated the factors relevant for evaluating ripeness as: '(1) whether the issues involved are purely legal, (2) whether the agency's action is final, (3) whether the action has or will have an immediate impact on the petitioner, and (4) whether resolution of the issue will assist the agency in effective enforcement and administration.'  '[T]he two tests essentially include all the same considerations.'"  Farrell-Cooper Mining Co. v. United States DOI, 728 F.3d 1229, 1235 n.3 (10th Cir. 2013) (citing Los Alamos Study Grp. v. Dep't of Energy, 692 F.3d 1057, 1065 & 1065 n.1 (10th Cir. 2012) (one citation omitted).

12

issues presented.'" Farrell-Cooper Mining Co. v. United States DOI, 728 F.3d 1229, 1234–35 (10th Cir. 2013) (quoting Sierra Club v. Dep't of Energy, 287 F.3d 1256, 1262–63 (10th Cir. 2002)).

A handful of factors cut in favor of our concluding that these appeals are, in fact, ripe for review. These appeals do present a clear legal issue: whether the BLM had statutory authority to promulgate the Fracking Regulation. See Abbott Labs., 387 U.S. at 149 (reviewing an agency's interpretation of a statute under the APA is a purely legal issue); see also Farrell-Cooper, 728 F.3d at 1235 (same). In addition, there is no dispute that the Fracking Regulation went through notice and comment and thus is final. Abbott Labs., 387 U.S. at 151.

However, our proceeding to address whether the district court erred in invalidating the BLM's Fracking Regulation when the BLM has now commenced rescinding that same regulation appears to be a very wasteful use of limited judicial resources. Utah v. United States DOI, 535 F.3d 1184, 1198 (10th Cir. 2008) ("allowing this controversy to ripen will have tangible benefits to judicial economy"). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Farrell-Cooper, 728 F.3d at 1238 (quoting Texas v. United States, 523 U.S. 296, 300 (1998)). The BLM has clearly expressed its intent to rescind the Fracking Regulation, and whether all or part of the Fracking Regulation will be rescinded is now an open question. As recently as July 25, 2017, the BLM has issued notice

13

of its proposed rule to entirely rescind the disputed Fracking Regulation and return the affected sections of the Code of Federal Regulations to the language that existed before the effective date of the Fracking Regulation. Rescission of a 2015 Rule, 82 Fed. Reg. at 34,464. It is clearly evident that the disputed matter that forms the basis for our jurisdiction has thus become a moving target. These appeals present an "unusual circumstance" that requires us to conclude that these appeals are unfit for review. See Abbott Labs., 387 U.S. at 153 (finding the instant case ripe but stating that "unusual circumstances" may be a basis for declining to hear a case in the future); see also API v. EPA, 683 F.3d 382, 389 (D.C. Cir. 2012) (explaining that because the agency's statutory interpretation was at issue in the case, it was better to wait until the agency's regulatory revision process was complete).

(2) Hardship to the parties of withholding review

With respect to this question, we consider whether withholding review would "create adverse effects of a strictly legal kind" to the party seeking judicial review. Nat'l Park Hosp. Ass'n, 538 U.S. at 809 (quotation omitted); see also Abbott Labs., 387 U.S. at 153 (considering harm to the party seeking appellate review). The relevant hardship is that which "would be suffered by the parties if we do not decide the case now." Skull Valley Band of Goshute Indians v. Nielson, 376 F.3d 1223, 1238 (10th Cir. 2004). That is, we look for a "direct and immediate dilemma" caused by our withholding review. Awad v. Ziriax, 670

14

F.3d 1111, 1125 (10th Cir. 2012); see also Skull Valley Band, 376 F.3d at 1238–39; John Roe #2 v. Ogden, 253 F.3d 1225, 1231–32 (10th Cir. 2001). Previous cases have recognized "two categories" of instances in which "we have afforded significant weight to the hardship element": "significant costs, financial or otherwise," and instances in which "the defendant had taken some concrete action that threatened to impair—or had already impaired—the plaintiffs' interests." Utah, 535 F.3d at 1197–98.

In cases challenging agency actions, we have held that a party seeking judicial review suffers adverse effects if, absent judicial review and while the appeal is pending, it would need to comply with the challenged agency regulation. Abbott Labs., 387 U.S. at 153 (withholding review would require companies seeking review to comply with the contested regulation, at significant loss of time and money, or face serious penalties); Utah, 535 F.3d at 1197–98; Skull Valley Band, 376 F.3d at 1238–39 (referring to "the uncertainty of not knowing whether they will be required to incur the substantial expenses and comply with the numerous regulatory requirements imposed by the Utah statutes"); Farrell-Cooper, 728 F.3d at 1237 ("[A] delay in our review will not lead to hardship for Farrell-Cooper because the company is not faced with the choice of complying with [the] challenged reclamation requirements or facing sanctions."); see also Nat'l Park Hosp. Ass'n, 538 U.S. at 810 (citing Abbott Labs., 387 U.S. at 152–53) (noting that the disputed regulation "does not affect a [petitioner]'s

15

primary conduct").

We focus here upon the harm caused by the challenged action, which, in this instance, is the Fracking Regulation. Withholding review of the Fracking Regulation will not impose a hardship on the two parties seeking judicial review: the Citizen Group Intervenors and the BLM. The only "harm" the Citizen Group Intervenors will suffer is the continued operation of oil and gas development on federal lands, which represents no departure from the status quo since 2015. And while they seek to benefit from the regulatory protection of the Fracking Regulation, which they hope our judicial review will insure, that is not a "hardship" contemplated by the prudential ripeness rubric. Nor will our withholding review create a hardship for the BLM. The BLM will be able to proceed with its proposed rule rescinding the Fracking Regulation. And, in these unique cases, the BLM would face more uncertainty if these appeals, which concern the scope of the BLM's authority, were to remain under advisement, or if we were to rule in the midst of the BLM's ongoing rulemaking process that the BLM had no authority to act. We conclude these appeals are prudentially unripe and thus unfit for judicial review.

C

We must next decide whether to abate these appeals, or to dismiss them. The D.C. Circuit has abated appeals that it found prudentially unripe when the promulgating agency decided to revise the contested regulation while an appeal

16

was pending.  For instance, in API v. EPA, both the American Petroleum Institute and the Sierra Club petitioned for review of a 2008 EPA regulation that failed to exclude refinery catalysts from a list of deregulated chemicals.  683 F.3d at 386. The EPA settled with the Sierra Club, agreeing to draft a new regulation that addressed the group's environmental concerns and to take final action on the regulation by a specific date.  Id.  After appellate briefing was complete, the EPA proposed a regulation that would partially deregulate the contested chemicals, pursuant to the parties' settlement agreement.  Id. at 386–87.  The proposed regulation would have "narrow[ed] the legal issues involved in [the] dispute and provide[d] a more final concrete setting for deciding any issues left on the table," resulting in the court concluding that abatement of the appeal pending final rulemaking was appropriate.  Id. at 388.

But the present appeals differ from API in two critical ways.  First, in API, the EPA was legally required by a settlement agreement to issue a final regulation by a specific date, just over a year after the case was argued.  Id. at 389.  Here, the BLM stated at our very recent oral argument that the 60 day notice and comment period could be extended, to say nothing of how many additional months or years would be needed to issue a final rule rescinding the regulation. Indeed, this court has traditionally abated appeals only for a short or definite period of time, and most commonly to allow other tribunals time to adjudicate related issues or cases.  E.g., Thlopthlocco Tribal Town v. Stidham, 762 F.3d

17

1226, 1241–42 (10th Cir. 2014) (abating appeal pending tribal court remedies); Casanova v. Ulibarri, 595 F.3d 1120, 1123 (10th Cir. 2010) (pending the district court's adjudication of post trial motion); Douglas v. Workman, 560 F.3d 1156, 1167 (10th Cir. 2009) (pending the district court's disposition of a second habeas petition). We are unwilling to abate these appeals for an indefinite period of time, especially given that we know from the record presented that it took five years for the BLM to promulgate the Fracking Regulation in the first place.

We acknowledge the difficult position in which the BLM finds itself by first filing an appeal to challenge the district court's invalidation of the Fracking Regulation, only now to ask this court to withhold ruling on its appeal pending final resolution of the BLM's action to rescind the very regulation it had initially sought to uphold and enforce. And although we acknowledge the BLM's offer to provide regular status reports while the proposed rescission of the Fracking Regulation is ongoing, it is not the role of Article III courts to supervise or monitor the rulemaking efforts of an Article II agency. See Marbury v. Madison, 5 U.S. 137, 166 (1803); see also Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 866 (1984) ("The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: 'Our Constitution vests such responsibilities in the political branches.'" (quoting TVA v. Hill, 437 U.S. 153, 195 (1978))). We acknowledge the court in API did order status reports, but its doing so was not agency

18

supervision; it was honoring a legally binding settlement between two parties, a task properly within the judicial wheelhouse. See United States v. Hardage, 982 F.2d 1491, 1496 (10th Cir. 1993) ("A trial court has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it."); see also Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1186 (10th Cir. 2002) ("[W]e review the court's approval of the settlement agreement for an abuse of discretion." (quoting Hardage, 982 F.2d at 1495)).

Second, API involved the direct judicial review of an agency's regulation; here, the appeals are challenging a final judgment of a federal district court striking down an agency regulation. We are one critical level removed from the agency's decision making process.

We conclude these appeals should be dismissed. We have previously dismissed appeals upon finding the subject matter unripe, particularly where the record is notably undeveloped or the future particularly uncertain. E.g., United States v. Bennett, 823 F.3d 1316, 1327 (10th Cir. 2016) (finding a special condition of supervised release that would not be imposed for another 10 years to be "not yet sufficiently concrete"); Utah, 535 F.3d at 1186, 1192 (explaining that the case turned on how the BLM would apply a settlement agreement in the future); Park Lake Res. v. United States Dep't of Agric., 197 F.3d 448, 454 (10th Cir. 1999) (noting that "further agency action could render this challenge moot"). Given the Fracking Regulation's uncertain future, we conclude dismissal of the

19

present appeals is appropriate here.

## D

We turn, then, to the effect our dismissal of these appeals has upon the underlying district court ruling. This court has authority under 28 U.S.C. § 2106 to craft whatever remedy is appropriate, including vacatur. United States Bancorp Mortg. Co. v. Bonner Mall P'ship, 513 U.S. 18, 21 (1994). "[Section] 2106 authorizes the Court to vacate, as well as reverse, affirm or modify, any judgment lawfully brought before it for review." Fay v. Noia, 372 U.S. 391, 467 n.25 (1963) (emphasis added) (overruled on other grounds as noted in Andrews v. Deland, 943 F.2d 1162, 1189 n.41 (10th Cir. 1991)). We have previously vacated district court judgments after finding the appeals taken from those judgments unripe. See, e.g., Bennett, 823 F.3d at 1327 (10th Cir. 2016); Farrell-Cooper, 728 F.3d at 1235, 1239; Utah, 535 F.3d at 1186, 1192; see also Bumper v. North Carolina, 391 U.S. 543, 562 (1968) (White, J., dissenting) (contemplating that vacatur was appropriate after finding a case unripe).

We are also guided by our cases discussing mootness. When an appeal becomes moot, we generally vacate the district court's judgment to prevent it "from spawning any legal consequences." United States v. Munsingwear, Inc., 340 U.S. 36, 41 (1950). But "if the party seeking vacatur has caused mootness, generally we do not order vacatur." Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1129 (10th Cir. 2010); see also Bancorp, 513 U.S. at

20

24–25 ("The principal condition to which we have looked is whether the party seeking relief from the judgment below caused the mootness by voluntary action.").

Applying this precedent to the present appeals, we note that the party seeking vacatur did not cause these appeals to become prudentially unripe. The Conservation Group Intervenors was the only party to request vacatur in its supplemental briefing, but it came to that suggestion only after arguing these appeals were prudentially moot. Conservation Groups Supp. Br. at 29–31. We note also that it was the actions of Secretary Zinke and the BLM that rendered these appeals prudentially unripe; namely, the issuance of Secretarial Order No. 3349 and the July 25, 2017 notice proposing a proposed rule that will rescind in full the Fracking Regulation. Rescission of a 2015 Rule, 82 Fed. Reg. at 34,464. But even if these federal appellants had requested vacatur, it is not apparent that they took these actions to intentionally evade review. See Bancorp, 513 U.S. at 24–25; cf. Wyoming v. United States DOI, 587 F.3d 1245, 1252 (10th Cir. 2009). We therefore conclude vacatur is appropriate here.

Finally, we must decide whether we should also dismiss the underlying action. As a practical matter, dismissing the underlying action is appropriate in this case given that there would be nothing for the district court to do upon remand except wait for the BLM to finalize its rule rescinding the Fracking Regulation. Moreover, in similar cases, we have dismissed the underlying action

21

after concluding on appeal that the subject matter of the case was unripe.  E.g., Utah, 535 F.3d at 1186, 1192; Park Lake Res., 197 F.3d at 454.  Here, the proposed rescission of the Fracking Regulation supports our dismissal of the underlying action as prudentially unripe.

Given that we are vacating the district court's opinion and dismissing the underlying action, we need not address the additional arguments raised by the Ute Indian Tribe challenging the district court's ruling as regards the Tribe.

III

We DISMISS these appeals as prudentially unripe, VACATE the district court's judgment invalidating the Fracking Regulation, and REMAND with instructions to dismiss the underlying action without prejudice.

16-8068 – State of Wyoming, et al. v. Zinke, et al.
16-8069 – State of Wyoming, et al. v. DOI, et al.

**HARTZ,** Circuit Judge, concurring and dissenting:

I agree with much in the panel opinion. In particular, I am in full accord that "our proceeding to address whether the district court erred in invalidating the BLM's Fracking Regulation when the BLM has now commenced rescinding that same regulation appears to be a very wasteful use of limited judicial resources." Op. at 13. Even if we were to decide within a relatively short period that the district court erred on the principal issue now before us, it would likely still be a long time before the Regulation could be judicially affirmed. The district court originally granted a preliminary injunction on both the ground before us and an additional ground—that the regulation was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and therefore invalid under 5 U.S.C. § 706(2)(A). Thus, if we reverse, the district court may well reinstate a preliminary injunction. That would certainly lead to another round of review. And the second round could be lengthy. This round began two years ago with the original grant of a preliminary injunction. Before the second round is complete the new administration may rescind the Regulation. The Citizen Group Intervenors suggest that even so, our ruling would be useful in settling the legal issues now on appeal. But a decision by one circuit court is hardly definitive.

That presents the question of what to do while awaiting a new regulation. Should we leave in effect the district court's order invalidating the Regulation, or should we vacate or stay that order, giving effect to the Regulation? The majority has chosen to vacate the district court's order. Perhaps that is the proper choice. In my view, however,

we do not have adequate information to make that determination. One important, and perhaps decisive, consideration is the extent of potential harms to the parties and the public. And on the record before us, I cannot assess how much, if any, environmental risk would be created by keeping the district court's injunction in effect or how much, if any, harm would be caused to the industry or the governmental parties by vacating the injunction. The proper institution to make that assessment, after an evidentiary hearing, is the district court. I would remand to that court for this purpose.

On the other hand, I would affirm the permanent injunction with respect to the Ute Indian Tribe. The Tribe has adequately raised the issues specific to it both in district court and in this court. Yet the other parties have failed to challenge the Tribe's reasoning. I would treat that failure as a waiver and affirm judgment for the Tribe with respect to Indian lands. Resolving that matter would entail no waste of judicial resources.